**NOT YET SCHEDULED FOR ORAL ARGUMENT**

# United States Court of Appeals
# for the District of Columbia Circuit

### No. 22-7136

3534 EAST CAP VENTURE, LLC; McCULLOUGH CONSTRUCTION, LLC,

*Plaintiffs-Appellants,*

*v.*

WESTCHESTER FIRE INSURANCE COMPANY;
ENDURANCE AMERICAN INSURANCE COMPANY,

*Defendants-Appellees.*

*On Appeal from the United States District Court for the District of Columbia in No. 1:19-cv-02946-APM, Amit Priyavadan Mehta, U.S. District Judge*

## FINAL BRIEF FOR PLAINTIFFS-APPELLANTS

MITCHELL Y. MIRVISS
ELIZABETH CLARK RINEHART
VENABLE LLP
750 East Pratt Street, Suite 900
Baltimore, Maryland 21202
Tel.: (410) 244-7400
Fax: (410) 244-7742
mymirviss@venable.com
ecrinehart@venable.com

ERIK BROCH LAWSON
SILVER & BROWN, P.C.
10621 Jones Street, Suite 101
Fairfax, Virginia 22030
Tel.: (703) 591-6666
Fax: (703) 591-5618
erik@virginia-lawyers.net

*Counsel for Plaintiffs-Appellants*

June 30, 2023



CASE NO. 22-7136

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

3534 EAST CAP VENTURE, LLC AND
McCULLOUGH CONSTRUCTION, LLC

Appellants,

v.

WESTCHESTER FIRE INSURANCE COMPANY AND
ENDURANCE AMERICAN INSURANCE COMPANY,

Respondent,

_____

**APPELLANTS' CERTIFICATE AS TO PARTIES, RULINGS AND
RELATED CASES**

_____

**Erik B. Lawson, Esquire**
**SILVER & BROWN, P.C.**
**10621 Jones Street**
**Suite 101**
**Fairfax, Virginia 22030**
**(703) 591-6666**
**(703) 591-5618 – Facsimile**

**Mitchell Y. Mirviss**
**Elizabeth C. Rinehart**
**VENABLE LLP**
**750 East Pratt Street, Suite 900**
**Baltimore, MD 21202**
**(410) 244-7400**
**(410) 244-7742 -Facsimile**

ATTORNEYS FOR APPELLANTS 3534 EAST CAP VENTURE, LLC AND
McCULLOUGH CONSTRUCTION, LLC

Pursuant to this Court's order, Appellants, 3534 East Cap Venture, LLC and McCullough Construction, LLC, hereby submit the certificate of parties, rulings and related cases.

**PARTIES:**

The Appellants (Plaintiffs) are:

1. 3534 East Cap Venture, LLC
2. McCullough Construction, LLC

The Appellees (Defendants) are:

3. Westchester Fire Insurance Company
4. Endurance American Insurance Company

**RULINGS:**

The ruling under review is the September 29, 2022 Order by the District Court of the District of Columbia (Amit P. Mehta) in Civil Action 19-cv-02946 granting the Defendants' Motion for Summary Judgment and denying the Plaintiff's Cross Motion for Summary Judgment.

**RELATED CASES:**

None.

Dated: November 14, 2022

Respectfully Submitted,

By: /s/ Erik B. Lawson
       SILVER & BROWN, P.C.
       10621 Jones Street
       Suite 101
       Fairfax, Virginia 22030
       (703) 591-6666
       (703) 591-5618 – Facsimile
       Attorney for Appellants


By:   /s/ Mitchell Y Mirviss
       Mitchell Y. Mirviss
       Elizabeth C. Rinehart
       VENABLE LLP
       750 East Pratt Street, Suite 900
       Baltimore, MD 21202
       (410) 244-7400
       (410) 244-7742 -Facsimile
       Attorneys for Appellants


## CERTIFICATE OF SERVICE

I   hereby certify that on November 14, 2022, I electronically filed the foregoing with the Clerk for the Court of the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. I further certify that this document was served on all parties or their counsel of record through the appellate CM/ECF system.

Daniel Maurice O'Connell, Esquire
Philip Charles Silverberg, Esquire
Mound Cotton Wollan & Greengrass LLP
One New York Plaza, 44th Floor
New York, NY 10004
(212) 804-4200
(212) 344-8066 – Facsimile
psilverberg@moundcotton.com
doconnell@moundcotton.com
*Attorneys for Westchester Fire Insurance Company and*
*Endurance American Insurance Company*


James P. Steele, Esquire
CARR MALONEY, P.C.
2020 K Street, N.W.
Suite 850
Washington, D.C. 20006
(202) 310-5500
(202) 310-5555
jps@carrmaloney.com
*Attorneys for Westchester Fire Insurance Company and*
*Endurance American Insurance Company*


/s/ Erik B. Lawson
Erik B. Lawson

CASE NO. 22-7136

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

3534 EAST CAP VENTURE, LLC AND
McCULLOUGH CONSTRUCTION, LLC

Appellants,
v.
WESTCHESTER FIRE INSURANCE COMPANY AND
ENDURANCE AMERICAN INSURANCE COMPANY,

Respondent,

_____

**APPELLANTS' CORPORATE DISCLOSURE**

_____

**Erik B. Lawson, Esquire**
**SILVER & BROWN, P.C.**
**10621 Jones Street, Suite 101**
**Fairfax, Virginia 22030**
**(703) 591-6666**
**(703) 591-5618 – Facsimile**

**Mitchell Y. Mirviss**
**Elizabeth C. Rinehart**
**VENABLE LLP**
**750 East Pratt Street, Suite 900**
**Baltimore, MD 21202**
**(410) 244-7400**
**(410) 244-7742 -Facsimile**

ATTORNEYS FOR APPELLANTS 3534 EAST CAP VENTURE, LLC
AND McCULLOUGH CONSTRUCTION, LLC

Pursuant to D.C. Cir. Rule 26.1 of the Rules of the United States Court of Appeals District of Columbia Circuit, Appellants, 3534 East Cap Venture, LLC and McCullough Construction LLC, by and through its undersigned counsel, state as follows:

I, the undersigned, counsel of record for 3534 East Cap Venture, LLC, certify that to the best of my knowledge and belief, the following are parent companies, subsidiaries, affiliates, or companies which own at least 10% of the stock[1] of 3534 East Cap Venture, LLC, which have any outstanding securities in the hands of the public:

- *3534 East Cap Venture, LLC is owned in an amount greater than 10% by a subsidiary of Wells Fargo Bank, N.A., which in turn is wholly owned by Wells Fargo & Company. Wells Fargo & Company is a publicly traded corporation on the New York Stock Exchange under the symbol WFC.*

- *There is no other entity that owns 10% or more of the ownership interest in 3534 East Cap Venture, LLC which, to the knowledge of counsel, has any outstanding securities in the hands of the public.*

Further, I, the undersigned, counsel of record for McCullough Construction, LLC, certify that to the best of my knowledge and belief, no entity that owns 10% or more of the ownership interest in McCullough Construction, LLC which, to the knowledge of counsel, has any outstanding securities in the hands of the public.

Respectfully Submitted,

---

[1] Or membership or other ownership interest.

By: /s/ Erik B. Lawson
       SILVER & BROWN, P.C.
       10621 Jones Street
       Suite 101
       Fairfax, Virginia 22030
       (703) 591-6666
       (703) 591-5618 – Facsimile
       Attorney for Appellants


By:   /s/ Mitchell Y Mirviss
       Mitchell Y. Mirviss
       Elizabeth C. Rinehart
       VENABLE LLP
       750 East Pratt Street, Suite 900
       Baltimore, MD 21202
       (410) 244-7400
       (410) 244-7742 -Facsimile
       Attorneys for Appellants


## CERTIFICATE OF SERVICE

I hereby certify that on November 14, 2022, I electronically filed the foregoing with the Clerk for the Court of the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. I further certify that this document was served on all parties or their counsel of record through the appellate CM/ECF system.

Daniel Maurice O'Connell, Esquire
Philip Charles Silverberg, Esquire
Mound Cotton Wollan & Greengrass LLP
One New York Plaza, 44th Floor
New York, NY 10004
(212) 804-4200
(212) 344-8066 – Facsimile
psilverberg@moundcotton.com
doconnell@moundcotton.com
*Attorneys for Westchester Fire Insurance Company and*
*Endurance American Insurance Company*


James P. Steele, Esquire
CARR MALONEY, P.C.
2020 K Street, N.W.
Suite 850
Washington, D.C. 20006
(202) 310-5500
(202) 310-5555
jps@carrmaloney.com
*Attorneys for Westchester Fire Insurance Company and*
*Endurance American Insurance Company*

/s/ Erik B. Lawson
Erik B. Lawson

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. ii

JURISDICTIONAL STATEMENT ....................................................... 1

STATEMENT OF ISSUES .................................................................. 2

STATEMENT OF THE CASE ............................................................. 2

    A.    THE PARTIES AND THE INSURANCE POLICIES ....................... 2

    B.    A FAILURE TO BUILD A VAPOR BARRIER CAUSED
          EXTENSIVE WATER DAMAGE TO THE PROPERTY,
          BUT THE INSURERS DENY COVERAGE ...................................... 3

    C.    GRANT OF SUMMARY JUDGMENT TO THE INSURERS .......... 5

SUMMARY OF ARGUMENT ............................................................ 8

ARGUMENT ...................................................................................... 10

    A.    STANDARD OF REVIEW ................................................................ 10

    B.    INTERPRETATION OF INSURANCE CONTRACTS .................... 11

    C.    THE DISTRICT COURT ERRED IN CONCLUDING
          THAT THE INSUREDS' LOSS WAS EXCLUDED ........................ 14

          1.    "Dampness of atmosphere" and "changes in
               temperature" do not mean accumulated water ......................... 15

               a.    "Dampness of atmosphere" refers to external
                    atmospheric conditions .................................................. 16

               b.    "Dampness of atmosphere" and "changes in
                    temperature" are separate perils from
                    accumulated water .......................................................... 27

          2.    The loss was covered water damage ensuing from
                faulty workmanship ................................................................ 33

          3.    The "ensuing loss" exception applies and negates each
               exclusion, including the exclusion for faulty
               workmanship ......................................................................... 38

CONCLUSION .................................................................................. 50

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Acme Galvanizing Co. v. Fireman's Fund Ins. Co.*,
    270 Cal. Rptr. 405 (Cal. Ct. App. 1990)......................................................29

*Aetna Ca. & Surety Co. v. Yates*,
    344 F.2d 939 (5th Cir. 1965) ......................................................................26

*Allstate Ins. Co. v. Smith*,
    929 F.2d 447 (9th Cir. 1991) ......................................................................37

*Andrioff v. Columbus Van & Storage, Inc.*,
    No. 75AP-38, 1975 Ohio App. LEXIS 8194
    (Ohio Ct. App. May 6, 1975).......................................................................33

*Arnold v. Cincinnati Ins. Co.*,
    688 N.W.2d 708 (Wis. 2004) ......................................................................43

*Aschenbrenner v. USF&G Co.*,
    292 U.S. 80 (1934).......................................................................................12

*Ass'n of Apartment Owners of Imperial Plaza v. Fireman's Fund Ins. Co.*,
    939 F. Supp. 2d 1059 (D. Haw. 2013)................................................. 13, 42

*Bartram, LLC v. Landmark Am. Ins. Co.*,
    864 F. Supp. 2d 1229 (N.D. Fla. 2012) ............................................... 42, 44

*Bethany Boardwalk Grp. LLC v. Everest Sec. Ins. Co.*,
    No. ELH-18-3918, 2020 WL 1063060........................................... 41, 45, 46

*\*Blaine Constr. Corp. v. Ins. Co. of N. Am.*,
    171 F.3d 343 (6th Cir. 1999) ......................................... 6, 16, 17, 18, 19, 20,
                               21, 22, 24, 25, 26, 39

*Boardwalk Condo. Ass'n v. Travelers Indem. Co.*,
    No. 03cv505 WQH (WMc), 2007 U.S. Dist. LEXIS 48325
    (S.D. Cal. July 3, 2007) ...............................................................................29

*Bode & Grenier, LLP v. Knight*,
    808 F.3d 852 (D.C. Cir. 2015).....................................................................10

*Burnham & Brady, Inc. v. Graphic Arts Mut. Ins. Co.*,
    No. 96-0255722S, 1998 Conn. Super. LEXIS 1976 (July 6, 1998)..............23

*C.D. Spangler Constr. Co. v. Indus. Crankshaft & Eng'g Co.*,
    388 S.E.2d 557 (N.C. 1990) ..........................................................................25

*C.H. Leavell & Co. v. Fireman's Fund Ins. Co.*,
    372 F.2d 784 (9th Cir.1967) .......................................................................13

*Cameron v. USAA Prop. & Cas. Ins. Co.*,
    733 A.2d 965 (D.C. 1999) ................................................................. 11, 12

*Cavalier Grp. v. Strescon Indus., Inc.*,
    782 F. Supp. 946 (D. Del. 1992) ................................................................14

*Chase v. State Farm Fire & Cas. Co.*,
    780 A.2d 1123 (D.C. 2001) .......................................... 11-12, 21, 35, 36, 47

*Columbiaknit, Inc. v. Affiliated FM Ins. Co.*,
    No. CIV. 98-434-HU, 1999 WL 619100 (D. Or. Aug. 4, 1999)........... 13, 14

*Conesco Indus. v. Conforti & Eisele, Inc.*,
    627 F.2d 312 (D.C. Cir. 1980).....................................................................42

*Cont'l Cas. Co. v. Rapid-Am. Corp.*,
    609 N.E.2d 506 (N.Y. 1993) .......................................................................19

*Dawson Farms, L.L.C. v. Millers Mut. Fire Ins. Co.*,
    794 So. 2d 949 (La. Ct. App. 2001) ............................................................30

*Eckstein v. Cincinnati Ins. Co.*,
    469 F. Supp. 2d 444 (W.D. Ky. 2007) ........................................................43

*Fawcett House, Inc. v. Great Central Ins. Co.*,
    159 N.W.2d 268 (Minn. 1968) ....................................................................24

*Fireman's Fund Ins. Companies v. Ex-Cell-O Corp.*,
    702 F. Supp. 1317 (E.D. Mich. 1988) ........................................................25

*Forrest v. Verizon Comm'ns, Inc.*,
    805 A.2d 1007 (D.C. 2002) .........................................................................42

*Fruchtandler v. TriState Consumer Ins. Co.*,
    96 N.Y.S.3d 649 (N.Y. App. Div. 2019).....................................................43

*In re Estate of Corriea*,
    719 A.2d 1234 (D.C. 1998) .................................................................. 11, 37

*James McHugh Constr. Co. v. Travelers Prop. Cas. Co. of Am.*,
    223 F. Supp. 3d 462 (D. Md. 2016)............................................................45

*Jowite Ltd. P'ship v. Fed. Ins. Co.*,
    No. DLB-18-2413, 2020 WL 4748544 (D. Md. Aug. 17, 2020),
    *aff'd*, 2021 WL 5122173 (4th Cir. Nov. 4, 2021) ........................................45

*Krug v. Millers' Mut. Ins. Ass'n of Ill.*,
    495 P.2d 949 (Kan. 1972)..............................................................................11

*Kuo v. Home Ins. Co.*,
    502 N.Y.S.2d 756 (N.Y. App. Div. 1986)...............................................23-24

*Lang v. F.G. Arwood & Co.*,
    65 A.2d 194 (D.C. 1949) ...............................................................................11

*Leep v. Trinity Universal Ins. Co.*,
    261 F. Supp. 3d 1071 (D. Mont. 2017) .......................................... 42, 44, 45

*Lumbermens Mut. Cas. Co. v. S-W Indus., Inc.*,
    39 F.3d 1324 (6th Cir. 1994) ........................................................................19

*McEvoy v. Sec. Fire Ins. Co.*,
    73 A. 157 (Md. 1909) ....................................................................................42

*Miller v. Great Am. Ins. Co.*,
    601 F. Supp. 3d 953 (D. Kan. 2022) ............................................................35

*Mitchell v. Merriam*,
    188 F.2d 42 (D.C. Cir. 1951)........................................................................19

*Montefiore Med. Ctr. v. Am. Prot. Ins. Co.*,
    226 F. Supp. 2d 470 (S.D.N.Y. 2002) ..........................................................41

*N.Y. Life Ins. Co. v. Miller*,
    81 F.2d 263 (D.C. Cir. 1935)........................................................................11

*New Castle Cty. v. Hartford Accident & Indem. Co.*,
    933 F.2d 1162 (3d Cir. 1991) .......................................................................25

*Nyhus v. Travel Mgmt. Corp.*,
    466 F.2d 440 (D.C. Cir. 1972).....................................................................10

*Okla. Sch. Risk Mgmt. Tr. v. McAlester Pub. Sch.*,
    457 P.3d 997 (Okla. 2019)............................................................................24

*Old Town Canoe Co. v. Cont'l Cas. Co.*,
    No. 05-25-B-W, 2005 U.S. Dist. LEXIS 24402
    (D. Me. Oct. 20, 2005).................................................................... 23, 26, 27

*Pa. Indem. Fire Corp. v. Aldridge*,
    117 F.2d 774 (D.C. Cir. 1941)......................................................12

*Phoenix Ins. Co. v. Branch*,
    234 So. 2d 396 (Fla. 4th Dist. Ct. App. 1970)..............................13

*Purpura v. Cont'l Cas. Co.*,
    533 N.Y.S.2d 302 (N.Y. App. Div. 1988)............................. 18, 23

*Quadrangle Dev. Corp. v. Hartford Ins. Co.*,
    645 A.2d 1074 (D.C. 1994) ........................................... 36, 47

*Roger Cleveland Golf Co. v. Affiliated FM Ins. Co.*,
    No. SACV 08-00453 CJC (PLAx), 2008 U.S. Dist. LEXIS 127058
    (C.D. Cal. Oct. 15, 2008)...........................................................30

*Scottsdale Ins. Co. v. Sally Grp., LLC*,
    No. 4:11-cv-01184, 2012 U.S. Dist. LEXIS 47532
    (S.D. Tex. Apr. 3, 2012) ......................................... 30, 31

*Selective Way Ins. Co. v. Nat'l Fire Ins. Co.*,
    988 F. Supp. 2d 530 (D. Md. 2013)............................ 41, 42, 45

*Sherwood v. Wash. Post Co.*,
    871 F.2d 1144 (D.C. Cir. 1989)..................................................10

*Smalls v. State Farm Mut. Auto. Ins. Co.*,
    678 A.2d 32 (D.C. 1996) .............................................................12

*St. Paul Fire & Mar. Ins. v. Gen. Injectables*,
    No. 98-0737, 2000 U.S. Dist. LEXIS 2597 (W.D. Va. 2000).....................23

*Stanley v. Am. Motorists Ins. Co.*,
    73 A.2d 1 (Md. 1950) .................................................................26

*Sullins v. Allstate Ins. Co.*,
    667 A.2d 617 (Md. 1995) ............................................................24

*TMW Enters., Inc. v. Fed. Ins. Co.*,
    619 F.3d 574 (6th Cir. 2010) .....................................................44

*Transatlantic Fire Ins. Co. of Hamburg, Germany v. Dorsey*,
    56 Md. 70 (1881) .......................................................................42

*Travelers Indem. Co. of Ill. v.*
    *United Food & Commercial Workers Int'l Union*,
    770 A.2d 978 (D.C. 2001) ..........................................................12

*U.S. Mut. Accident Ass'n of the City of N.Y. v. Hodgkin*,
  4 App. D.C. 516 (1894) ...............................................................11

*USF&G Co. v. Wilkin Insulation Co.*,
  578 N.E.2d 926 (Ill. 1991)............................................... 18-19, 22

*Vision One, LLC v. Philadelphia Indem. Ins. Co.*,
  276 P.3d 300 (Wash. 2012) .........................................................44

*Wallach v. Rosenberg*,
  527 So. 2d 1386 (Fla. 3d Dist. Ct. App. 1988)....................... 13-14

*Weeks v. Co-Operative Ins. Co.*,
  817 A.2d 292 (N.H. 2003)...........................................................46

*Worldwide Sorbent Prods. v. Invensys Sys.*,
  No. 1:13-CV-252, 2014 U.S. Dist. LEXIS 206336
  (E.D. Tex. July 31, 2014) .................................................... 22, 23

**Statutes & Other Authorities:**

28 U.S.C. § 1291 ...........................................................................1

28 U.S.C. § 1332(a) .......................................................................1

2 Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance
  Coverage Disputes* § 21.04...........................................................40

4 Bruner & O'Connor Construction Law § 11:418 .................................41

13A *Couch on Insurance* 2D § 48:141 (1982 and supp. 1992).............13

16 Williston on Contracts § 49:18 (4th ed.)........................................25

Christopher French, *The "Ensuing Loss" Clause in Insurance Policies:
  The Forgotten and Misunderstood Antidote to Anti-Concurrent
  Causation Exclusions*,
  13 Nev. L.J. 215 (2012) ..................................................... 40, 43, 47

Dale L. Kingman, *First Party Property Policies and Pollution Coverage*,
  28 Gonz. L. Rev. 449 (1993) ........................................................13

Merriam-Webster.com (last visited Feb. 15, 2023)...............................49

*Webster's Third New International Dictionary*, 1966 Edition .................32

vi

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

The United States District Court for the District of Columbia (the "district court")

had jurisdiction over the underlying action pursuant to 28 U.S.C. § 1332(a).

## STATEMENT OF ISSUES

1.    Whether the district court erred by holding that dampness of atmosphere or extremes or changes in temperature caused the physical loss in this case, when it was undisputed that the loss was caused by failure to install a vapor barrier, which resulted in the accumulation of excessive water inside the building.

2.    Whether the district court erred in finding no insurance coverage for damage caused by water condensation caused by failure to install a vapor barrier, when the policies expressly cover "Water Damage," which they define as "the accumulation of water on any surface from any source."

3.    Whether the district court erred in finding no insurance coverage for claims for direct physical loss resulting from an insured peril, where the exclusions relied upon by the district court expressly provide that the exclusions do not apply to claims for direct physical loss resulting from an insured peril.

## STATEMENT OF THE CASE

### A.    THE PARTIES AND THE INSURANCE POLICIES.

Appellants 3534 East Cap Venture, LLC and McCullough Construction, LLC (collectively, the "Insureds"), are a developer and contractor, respectively, of

2

a condominium project (the "Project") at 3534 East Capitol Street, NE,

Washington, D.C. (the "Property").  (JA 1576).  The Insureds purchased from

Appellees Westchester Fire Insurance Company and Endurance American

Insurance Company (collectively, the "Insurers") two identical Builders' Risk

insurance policies (collectively, the "Policies") that each cover 50% of the risks of

loss to the Project.  (JA 1594, Policy).  The Insurers wrote the Policies using

typical industry-wide standard All-Risk Builder's Risk policies promulgated by

ISO Properties, Inc.  (JA 2628).  The Policies indemnify against all loss to real

property unless excluded and also pay soft costs, additional expenses, and other

enumerated damages resulting from a covered loss.  (JA 1631).

### B.    A FAILURE TO BUILD A VAPOR BARRIER CAUSED EXTENSIVE WATER DAMAGE TO THE PROPERTY, BUT THE INSURERS DENY COVERAGE.

On or about January 2019, while the Policies were in effect, the Insureds

suffered disastrous water damage to the Property.  (JA 2962; JA 1952).  Because

the architect had failed to specify installation of a vapor-barrier system, water

condensed inside the enclosed roof cavity of the building.  (JA 1575; JA 932-34,

957, 959; JA 1196-98, 1204, 1256, 1318).  This trapped, accumulated water

ultimately exceeded the capacity of the roof cavity, which was not intended to hold

such quantities of water, and spilled throughout the property, soaking into and

ruining the porous building components. (JA 1875-76). The project manager, Seamus McCullough, gave eyewitness testimony that water poured out of the insulation in the ceiling as if it was raining inside. (JA 1213). Wood, insulation, and drywall in the ceilings and walls throughout the building were soaked. (JA 1319-20).

Following the deluge, the Insureds investigated the extent of the damage. Mr. McCullough testified in deposition that, in his experience, the lack of vapor barrier was the only abnormal characteristic of the building and its environment. (JA 1273 (stating that the gypsum concrete was normal), JA 1314 (stating that the heaters were normal), JA 1196-97 (determining that the cause was the vapor-barrier defect). Other than the conditions caused by the lack of a vapor barrier, there was neither unusual dampness in the air nor changes in temperature. (JA2643-44 (stating that temperature did not cause the damage); JA 2545-46 (stating that no damage was caused by moisture in the air). Prior to condensation of the water, the building had not suffered any damage. (JA 2504-05). Indeed, when the defect in the vapor-barrier system was fixed, the water damage stopped. (JA 1838-39).

The Insureds reported a claim for the damage caused by the water to property other than the defective vapor-barrier system, which the Insurers denied,

citing a provision in the Policies that excludes losses caused by "Dryness or dampness of atmosphere" and "Extremes or changes in temperature." (JA 2957). The Insureds sued in the Superior Court of the District of Columbia on August 29, 2019, alleging that the Insurers breach their contractual obligations by denying the claim. (JA 130). On October 1, 2019, the Insurers removed the case to the district court. (JA 3).

### C.     GRANT OF SUMMARY JUDGMENT TO THE INSURERS.

The parties submitted the case for summary judgment prior to identifying expert witnesses. (JA 2977-79). Accordingly, summary judgment was adjudicated without any expert opinions on the scientific mechanism of the source of the water, whether the external or internal temperature or humidity of the building was abnormal or fluctuated to any extreme degree, or, even if such conditions existed, whether those conditions were the proximate cause of any direct physical loss or damage. Instead, the parties submitted the coverage issue on the undisputed fact that building elements were damaged by water due to the lack of a vapor barrier. (JA 1838-39).

The district court (Mehta, J.) decided the cross-motions on the papers, granting summary judgment to the Insurers and denying summary judgment to the Insureds. (JA 3018). The court confirmed that "[t]he parties agree on the chain of

5

events that led to the damage," and gave the following summary: "An architect failed to include a vapor barrier in the project design.  The absence of that barrier allowed condensation to form due to a combination of humidity-increasing conditions inside the building and a change in temperature outside the building. As the condensation accumulated, it seeped into and soaked the drywall, insulation, and other building materials."  (JA 3018-19).  After reciting the Policies' relevant exclusions, the district court "condense[d]" the dispute to (1) whether the "dampness of atmosphere" and "changes in temperature" exclusions include the instant circumstances, and (2) whether the Policies' coverage for an "ensuing loss" applies because "water damage" is an insured peril, even if the loss were caused by excluded conditions.  (*JA 3021*).

The district court found for the Insurers on both issues.  Regarding the interpretation of the exclusions for dampness of atmosphere and changes in temperature, it adopted the reasoning of the dissent in *Blaine Constr. Corp. v Ins. Co. of N. Am.*, 171 F.3d 343 (6th Cir. 1999), a case that the parties and the court agreed was based on "nearly identical" facts.  (JA 3023).  The majority in *Blaine* held that the term "atmosphere" was ambiguous because a reasonable insured person could interpret the term to apply only to weather conditions, rather than indoor humidity.  The dissent, however, found that the term was unambiguous and

that "'indoor humidity' is the 'most common' meaning of 'dampness of atmosphere.'" The district court agreed, concluding that the Insureds' argument was "contrary to ... commonsense," in that, "for Plaintiffs to prevail, one *reasonable* construction of 'dampness of atmosphere' would have to be that 'atmosphere' *only* means outdoor weather conditions." (JA 3025). Because it concluded that the terms were not ambiguous, the district court also rejected the Insureds' arguments that the "dampness of atmosphere" exclusion was meant to exclude building deterioration, rather than an internal deluge. (JA 3025).

Regarding the Insureds' second argument, the district court found that the "ensuing loss" provision could not be interpreted to provide coverage because the water damage, although a covered loss, was "'inextricably intertwined' with" the excluded perils, "[i]ndeed, ... they are 'one and the same....'" (JA 3029). For a similar reason, the court rejected the Insureds' argument that the loss was covered because it was a physical loss that resulted from faulty workmanship, and not a cost for "making good" the faulty workmanship. (JA 3029). It concluded that coverage for physical loss from faulty workmanship did not apply because the loss here was caused by the excluded perils, not faulty workmanship. (JA 3030). At no point did the district court analyze the loss as being caused by the lack of a vapor-barrier system or accumulated water.

7

## SUMMARY OF ARGUMENT

The district court erred in granting summary judgment to the Insurers because no reasonable interpretation of the Policies would exclude the extensive water damage caused by the failure to install a vapor barrier on the Insureds' Property, resulting in accumulated water damaging the building components.  In holding to the contrary, the district court erroneously interpreted exclusions for dampness of atmosphere and changes in temperature as excluding damage caused by the water that accumulated due to the lack of a vapor barrier.  This interpretation is analogous to holding that water damage from a roof installed with a sizeable hole, a window installed without glass, or a sprinkler system installed that activated without cause, would be excluded from coverage because it occurred in the presence of a damp atmosphere or change in temperature.  As here, neither excluded peril would have caused the damage had the *covered* peril not occurred.

No reasonable reader (nor a reasonable writer of insurance policies nor a reasonable purchaser of insurance) would interpret the exclusions to apply here, but, even if there is ambiguity, it should be interpreted in the Insureds' favor.  A reasonable interpretation of "dampness of atmosphere" is: water molecules in the air, not liquid water, that condensed in building cavities and soaked into building components.  This interpretation is supported by the Policies' definition of "water

8

damage," which includes, "the accumulation of water from any source on a roof or other surface of a building, dwelling or structure."  And a reasonable interpretation of an exclusion for "changes in temperature" is that it excludes losses caused directly by changes in outside temperature, not *normal* fluctuations of internal room temperature that a faulty roofing system could not manage properly, causing water to condense and accumulate.

The district court's analysis rests on the erroneous assumption that the loss in question was caused by dampness of the atmosphere and changes in temperature.  But this omits a material portion of the parties' stipulation for summary judgment: The loss was caused by the failure to install a vapor barrier and the resulting water accumulation.  Because the district court glossed over the lack of a vapor barrier and the presence of accumulated water in favor of the excluded perils, the court unsurprisingly also found that the water damage could not be covered as an "ensuing loss" because, based on the court's factually erroneous premise, the loss was inextricably intertwined with the excluded causes. Indeed, based on the district court's selective facts, the excluded perils were the *only* causes.  Similarly, by ignoring the stipulated fact that the Property's extensive physical damage was caused by the lack of vapor barrier—which was indisputably the result of faulty workmanship—and resulting accumulated water—which also is

9

indisputably a covered peril and loss within the Policy's definition of "water damage"—the court also erroneously concluded that coverage was not available under the Policy provisions that cover physical loss as a result of faulty workmanship.  For these reasons, the district court erred, and judgment should be reversed.

## ARGUMENT

### A.    STANDARD OF REVIEW

A district court's decision on summary judgment is reviewed *de novo*, as are issues of contract interpretation and choice-of-law.  *Bode & Grenier, LLP v. Knight*, 808 F.3d 852, 857, 862 (D.C. Cir. 2015).  "On a motion for summary judgment, [a court] cannot deny the existence of disputes over material facts by making findings of fact and then labelling them 'undisputed' or "make critical findings of fact."  *Sherwood v. Wash. Post Co.*, 871 F.2d 1144, 1147 (D.C. Cir. 1989).  The parties' decision to stipulate to certain facts does not concede that no material disputes of fact exist, nor does it permit the court to disregard material facts.  *Id.* at 1148 n.4.  Rather, "[t]he court's function is limited to ascertaining whether any factual issue pertinent to the controversy exists; it does not extend to resolution of any such issue."  *Nyhus v. Travel Mgmt. Corp.*, 466 F.2d 440, 442 (D.C. Cir. 1972).

## B.     INTERPRETATION OF INSURANCE CONTRACTS

The Policies are governed by the law of the District of Columbia.  Under D.C. law, "[a]n insurance policy is a contract between the insured and the insurer, and in construing it [a court] must first look to the language of the contract." *Cameron v. USAA Prop. & Cas. Ins. Co.*, 733 A.2d 965, 968 (D.C. 1999). Whenever "an insurer attempts to avoid liability under an insurance policy on the ground that the loss for which recovery is sought is covered by some exclusionary clause," the "burden is on [the insurer] to prove that the loss falls within an exclusion."  *Id.* & n.3 (quoting *Krug v. Millers' Mut. Ins. Ass'n of Ill.*, 495 P.2d 949, 954-55 (Kan. 1972), and citing *Lang v. F.G. Arwood & Co.*, 65 A.2d 194, 196 (D.C. 1949); *N.Y. Life Ins. Co. v. Miller*, 81 F.2d 263, 268 (D.C. Cir. 1935)). Moreover, "exclusions from coverage in an insurance policy will be construed narrowly."  *In re Estate of Corriea*, 719 A.2d 1234, 1243 (D.C. 1998).

"[I]t has long been 'a general rule of construction of policies of insurance ... that any reasonable doubt which may arise as to the meaning or intent of a condition thereof, will be resolved against the insurer."  *Cameron*, 733 A.2d at 968 (quoting *U.S. Mut. Accident Ass'n of the City of N.Y. v. Hodgkin*, 4 App. D.C. 516, 523 (1894)).  "Insurance contracts are complicated and often confusing instruments, employing specialized concepts and terminology."  *Chase v. State*

11

*Farm Fire & Cas. Co.*, 780 A.2d 1123, 1127 (D.C. 2001). It is the "insurer's duty to spell out in plainest terms—terms understandable to the man in the street—any exclusionary or delimiting policy provisions." *Travelers Indem. Co. of Ill. v. United Food & Commercial Workers Int'l Union*, 770 A.2d 978, 986 (D.C. 2001) (quoting *Cameron*, 733 A.2d at 968). "The phraseology of contracts of insurance is that chosen by the insurer and the contract in fixed form is tendered to the prospective policyholder who is often without technical training, and who rarely accepts it with a lawyer at his elbow." *Pa. Indem. Fire Corp. v. Aldridge*, 117 F.2d 774, 775 (D.C. Cir. 1941) (quoting *Aschenbrenner v. USF&G Co.*, 292 U.S. 80, 84 (1934)). "In recognition of these realities, ambiguities in an insurance policy are construed against the insurer and in favor of 'the reasonable expectations of the purchaser of the policy.'" *Chase*, 780 A.2d at 1127 (quoting *Smalls v. State Farm Mut. Auto. Ins. Co.*, 678 A.2d 32, 35 (D.C. 1996)). "The general rule applicable in the interpretation of an insurance policy is that, if its language is reasonably open to two constructions, the one most favorable to the insured will be adopted. Any fair doubt as to the meaning of its own words should be resolved against the insurer." *Id.* (quoting *Pa. Indem. Fire*, 117 F.2d at 775).

The Policies provide "all-risks" insurance, which means that they "provide coverage for any physical loss or damage to covered property from any external

cause except as otherwise specifically excluded." Dale L. Kingman, *First Party Property Policies and Pollution Coverage*, 28 Gonz. L. Rev. 449, 453 (1993) (citing 13A *Couch on Insurance* 2D § 48:141 (1982 and supp. 1992)). "An 'all risks' policy creates a special type of coverage extending to risks not usually covered under other insurance, and recovery under an 'all risk' policy will be allowed for all fortuitous losses ... unless the policy contains a specific provision *expressly excluding* the loss from coverage." *C.H. Leavell & Co. v. Fireman's Fund Ins. Co.*, 372 F.2d 784, 787 (9th Cir.1967) (emphasis added); *accord Ass'n of Apartment Owners of Imperial Plaza v. Fireman's Fund Ins. Co.*, 939 F. Supp. 2d 1059, 1070 (D. Haw. 2013) (same); *Columbiaknit, Inc. v. Affiliated FM Ins. Co.*, No. CIV. 98-434-HU, 1999 WL 619100, at *3 (D. Or. Aug. 4, 1999) ("[t]his constitutes a kind of special coverage extending to risks not usually contemplated, and coverage is usually found unless expressly excluded by the policy"); *Phoenix Ins. Co. v. Branch*, 234 So. 2d 396, 398 (Fla. 4th Dist. Ct. App. 1970) ("a special type of coverage extending to risks not usually covered under other insurance" covering all loss not resulting from insured's willful misconduct or fraud unless the policy contains "a specific provision expressly excluding the loss from coverage"). "'[A]ll-risks' policies are generally construed liberally in favor of coverage...." *Columbiaknit*, 1999 WL 619100, at *3; *see also Wallach v. Rosenberg*, 527 So. 2d

13

1386, 1388 (Fla. 3d Dist. Ct. App. 1988) (discussing the "liberal construction generally given all-risk insurance contracts.  The term *all-risk* is given a broad and comprehensive meaning."); *Cavalier Grp. v. Strescon Indus., Inc.*, 782 F. Supp. 946, 954 (D. Del. 1992) ("'all-risk' clauses should be given a broad and comprehensive meaning to cover incurred losses").  Thus, even though "exclusionary clauses are construed more strictly than coverage clauses, the insurer's burden is even heavier under an all-risk policy."  *Wallach*, 527 So. 2d at 1389 (internal citation omitted).[1]

### C.    THE DISTRICT COURT ERRED IN CONCLUDING THAT THE INSUREDS' LOSS WAS EXCLUDED.

The district court fundamentally erred in determining that the Insureds' loss is subject to exclusions for "dampness of atmosphere" and "changes in temperature" without accounting for the effect of the lack of a vapor barrier, which was the *stipulated* primary and proximate cause of the damage.  Moreover, those terms can be reasonably interpreted to apply to external atmospheric events, not internal condensation occurring without any proven alteration of humidity or

---

[1] D.C. cases have not addressed whether all-risk policies are liberally construed in favor of coverage, but their general approach reflects liberal construction.

temperature.  The district court's analysis thus incorrectly interprets the contract terms and contradicts the stipulated facts.

### 1.    "Dampness of atmosphere" and "changes in temperature" do not mean accumulated water.

The Policies reflect "all-risk" coverage providing indemnity for any risk of direct physical loss, unless excluded or limited.  (JA 1607).  To overcome the Policies' clear coverage, the Insurers rely on two of the Policies' exclusions: dampness of atmosphere and changes in temperature.  By their terms, these exclusions do not apply to direct physical losses caused by an insured peril.  The operative provisions state:

> This Policy does not insure LOSS caused by any of the following unless direct physical LOSS by an insured peril ensues and then this Policy insures only such ensuing direct physical LOSS:
>
> 1. Corrosion, decay, deterioration, erosion, evaporation, inherent vice, latent defect leakage, loss of weight, rust, shrinkage, wear and tear or any quality in property which causes it to damage or destroy itself.
> 2. Normal settling, shrinking, cracking, expansion or contraction.
> 3. Dryness or dampness of atmosphere.
> 4. Extremes or changes in temperature.

(JA 1617).  This language gives rise to three questions.  First: Is the word "atmosphere" reasonably open to be interpreted as external, atmospheric air, rather than internal conditions, as numerous courts have found, or, as the district court

15

ruled, is no such alternative meaning reasonable?  Second: Was the loss caused by water vapor (whether inside or outside the building), or by accumulated water caused by condensation resulting from the lack of a vapor barrier?  Third: Do the exclusions apply under the "ensuing loss" exception for direct physical loss caused by a covered peril, given that this is exactly what the Insureds seek: coverage for the direct physical loss caused by water damage, a covered peril?  The first issue is addressed in subsection (a) below, the second in subsection (b) below, and the third in section 3 below.

### a.    "Dampness of atmosphere" refers to external atmospheric conditions.

This case is on all fours with the Sixth Circuit's ruling in *Blaine Constr. Corp. v Ins. Co. of N. Am.*, 171 F.3d 343 (6th Cir. 1999), which reviewed identical policy exclusions and determined that they did not apply to virtually the same occurrence that happened here.  *Blaine* addressed a builder's all-risk property-damage policy in which a construction contractor sought to hold its insurance company liable for the cost of replacing ceiling insulation and drywall ruined by water that had condensed within the insulation cavity after a vapor barrier was improperly installed.  There, as here, a defect in the vapor-barrier system allowed condensation to form in the roof system and soak insulation and other porous surfaces.  There, as here, the threshold question was whether water damage from

16

the condensed water was covered because the "dampness of atmosphere" exclusion does not apply.

*Blaine* held that there is coverage under a builder's risk policy where "ceiling insulation [was] ruined by water that had condensed within the insulation cavity after a subcontractor failed to install a vapor barrier properly." *Id.* at 345. After discussing cases that found the term "atmosphere" to be ambiguous or to refer to the external air outside of buildings, *see id.* at 351-52, the Sixth Circuit reasoned that the exclusions for dampness of atmosphere and temperature changes could be reasonably read to refer to the outside weather:

> [W]e believe it is fair to read these cases as lending at least some support to Blaine's argument that ordinary men and women would be likely to understand a reference to "dampness or dryness of atmosphere; extremes or changes in temperature" as a reference to weather conditions, and not as a reference to artificially enhanced humidity inside a building.

> If INA had wanted to exclude dampness or dryness generally, the layman might think, there would have been no need to use the word "atmosphere" at all. The insurance company could simply have described the excluded peril as "dampness or dryness." By adding a word that would not have been necessary if the company had not intended to refer to the "atmosphere" in the most commonly used sense, and by speaking in the next breath of "extremes or changes in temperature," INA ran the risk, it seems to us, of being taken to mean that it was simply talking about weather conditions -- the extreme heat and humidity of Florida, e.g., or the sub-zero temperatures of Alaska.

*Id.* at 351.  Because it is reasonable to interpret the dampness-of-atmosphere clause as referring to the air enveloping the earth, as opposed to air trapped within a space in the roof system, the *Blaine* majority held that the clause was ambiguous and should be interpreted against the insurer and in favor of coverage.  *Blaine* supports the grant of summary judgment in favor of the Insureds.

*Blaine* cited ample authority supporting this holding.  It found a New York case interpreting an exclusion for, *inter alia*, "dampness of atmosphere" and "change of temperature" to be ambiguous as "quite instructive here" because it "strongly suggests that the exclusion should be found to be ambiguous in its application to the loss suffered here."  *Id.* at 352 (citing *Purpura v. Cont'l Cas. Co.*, 533 N.Y.S.2d 302, 303 (N.Y. App. Div. 1988)).  Most notably, the Sixth Circuit agreed with *Purpura*'s ruling that, "'We find the 'change of temperature'' exclusion ... to be *ambiguous* since, read in context, and according it the meaning 'which would be given it by the average man' ... *it may reasonably refer to changes in the weather* ... which was not the cause of the loss suffered at bar.'"  *Id.* (quoting *Purpura*, 533 N.Y.S.2d at 303 (emphasis supplied and citations omitted by the court)).  Similarly, the Sixth Circuit agreed that "it is also true that '[t]he ordinary, popular meaning of the phrase 'the atmosphere' connotes the external atmosphere which surrounds the earth.'"  *Id.* at 351 (quoting *USF&G Co. v. Wilkin*

*Insulation Co.*, 578 N.E.2d 926, 933 (Ill. 1991)); *see also id.* at 351 (citing *Cont'l Cas. Co. v. Rapid-Am. Corp.*, 609 N.E.2d 506, 513 (N.Y. 1993) ("differing [dictionary] definitions point toward ambiguity in the meaning of 'atmosphere'"); *Lumbermens Mut. Cas. Co. v. S-W Indus., Inc*., 39 F.3d 1324, 1336 (6th Cir. 1994) (ruling that fumes confined to an indoor work area are not "discharged into the 'atmosphere,' as that word is ordinarily understood").

One judge on the *Blaine* panel dissented. *Id.* at 354-60 (Boggs, J., dissenting). The district court found this dissent to be persuasive, but the *Blaine* dissent is wrong under D.C. law and has not been adopted by other courts.

*First*, the dissent applies a rule of law on ambiguity that differs from D.C. law. In D.C., a provision is ambiguous where it is reasonably open to one or more interpretations either on its face or in view of surrounding facts.[2] The *Blaine* dissent applied a rule more favorable to the insurer in two respects: first, it placed the burden of proof on the insured, not the insurer, and second, it required the *insured* to prove that the insurer's interpretation is manifestly unreasonable.

---

[2] Ambiguities often arise when the policy is applied in a specific context. *See Mitchell v. Merriam*, 188 F.2d 42, 44 (D.C. Cir. 1951) ("Distinctions between 'latent' and 'patent' ambiguities are arbitrary and outmoded. 'How can we tell whether a [document] is clear and definite or ambiguous and uncertain until we know the surrounding facts?'" (citation omitted)).

19

*Blaine*, 171 F.3d at 355 (Boggs, J., dissenting) ("[The insured] must show us that 'dampness of atmosphere' *cannot* mean indoor humidity." (emphasis in original)). Under this approach, the insured cannot prevail if the terms are ambiguous; it must instead prove that the policy unambiguously allows only one reasonable interpretation. The dissent offered no citation in support, but this simply is not the standard for construing insurance policies in D.C. As the majority opinion explained, the proper question was whether the insurer proved that the exclusions could not be reasonably read to refer only to external weather (dampness, dryness, temperature changes). *See id.* at 352 ("while the [policy] exclusionary clause may not necessarily refer to the weather alone, it can reasonably be read that way in light of the meaning that the average man would be likely to ascribe to it."); *id.* (describing *insurer's* burden of showing "that no reasonable person could read the clause as referring just to the weather"). If such an interpretation was reasonable, then the policy language was subject to two reasonable interpretations: (a) excluding conditions caused by external conditions only (the insured's reading) vs. (b) excluding conditions caused by either external or indoor conditions (the insured's reading). If so, the provision was ambiguous and the insured prevailed. The insurer lost in *Blaine* because it failed to meet *its* burden of showing no

20

ambiguity (*i.e.*, it failed to show that "no reasonable person could read the clause as referring just to the weather").

The *Blaine* dissent's reasoning facially errs in two key respects: it transferred the burden of proving ambiguity (or the lack thereof) in an all-risk policy exclusion to the insured, and, in the process, made the burden much more onerous, effectively precluding coverage if the policy was ambiguous.  The insured not only needed to demonstrate that "dampness of atmosphere" *could* mean external conditions only, but it also had to show that the phrase *could not* be reasonably read to exclude losses caused by indoor or external conditions.  If the policy was ambiguous, the insured lost.  Thus, the *Blaine* dissent required the insured to prove there is no ambiguity at all.  On this basis alone, the *Blaine* dissent is not an appropriate guide for analysis under D.C. law (or, for that matter, the general black-letter rules of insurance law).  Nevertheless, the district court adopted this erroneous logic—that somehow the Insureds had to prove that the Insurers' interpretation could not be reached by a reasonable layman, flipping the applicable standard upside down.  *Contrast with Chase*, 780 A.2d at 1127 ("Any fair doubt as to the meaning of [the policy's] own words should be resolved against the insurer.").

21

*Second*, the dissent did not apply D.C. law cited above requiring exclusions to be narrowly construed and placing the burden on the insurer to prove that the exclusion applies (and thus that no reasonable person would accept the insured's interpretation of the policy terms). The district court's opinion thus suffers from the same flaws.

*Third*, since *Blaine* was decided twenty-four years ago, not one case agreed with the dissent until the district court's decision below. As the U.S. District Court for the Eastern District of Texas noted when rejecting the dissent's view of ambiguity: "None of the other cases considering this issue has adopted the view of the dissent in *Blaine Construction Corp.*, and this court likewise declines to do so." *Worldwide Sorbent Prods. v. Invensys Sys.*, No. 1:13-CV-252, 2014 U.S. Dist. LEXIS 206336, at *23 (E.D. Tex. July 31, 2014). Thus, in rejecting the *Blaine* majority, the district court adopted a singular minority view that no court had accepted in over two decades.

*Fourth*, not only did the *Blaine* majority apply mainstream law; it remains the majority rule today. For example, following *Blaine*, the U.S. District Court for the District of Maine ruled that the dampness-of-atmosphere and changes-in-temperature clauses are ambiguous and interpreted against the insurer. Citing the Illinois Supreme Court's decision in *USF&G v. Wilkins*, which *Blaine* had cited as

22

well, it ruled that the ordinary, popular meaning of the phrase "the atmosphere" connotes the external atmosphere surrounding the earth and that "the exclusion language encourages the impression that 'temperature' refers to ambient temperature, not artificially induced inside temperature." *Old Town Canoe Co. v. Cont'l Cas. Co.*, No. 05-25-B-W, 2005 U.S. Dist. LEXIS 24402, at *9 (D. Me. Oct. 20, 2005). Other courts finding the clauses "changes in temperature" and "dampness of atmosphere" ambiguous because atmosphere can reasonably mean outside dampness or dryness and because temperature can reasonably mean ambient external temperature include *Worldwide Sorbent Prods.*, 2014 U.S. Dist. LEXIS 206336, at *20 ("[S]everal cases considering language similar to the temperature exclusion have held it to be ambiguous."); *St. Paul Fire & Mar. Ins. v. Gen. Injectables*, No. 98-0737, 2000 U.S. Dist. LEXIS 2597, at *21 n.7 (W.D. Va. 2000) ("Reasonably interpreted, this provision would likely only apply to losses due to changes in weather, not changes in temperature due to the interruption of power to a refrigeration unit."); *Burnham & Brady, Inc. v. Graphic Arts Mut. Ins. Co.*, No. 96-0255722S, 1998 Conn. Super. LEXIS 1976, at *7-8 (July 6, 1998) (finding "persuasive" the "case law from other jurisdictions" interpreting "changes in temperature" to be ambiguous as applied to harm caused by "changes in ... outdoor temperature (weather)"); *Purpura*, 533 N.Y.S.2d at 303; *Kuo v. Home Ins.*

*Co.*, 502 N.Y.S.2d 756, 759-60 (N.Y. App. Div. 1986); *Fawcett House, Inc. v. Great Central Ins. Co.*, 159 N.W.2d 268, 270 (Minn. 1968) (holding that exclusion for "change in temperature or humidity" was ambiguous when applied to acts of vandalism (a covered peril) that turned off heating plant, resulting in ruptured frozen pipes, because exclusion could be reasonably read to refer to "weather" changes as the primary cause of damage, not to vandalism that eliminated building's internal heat).  These and the other cases cited by *Blaine* all weigh in favor of holding that the dampness of atmosphere and changes in temperature clauses in the deterioration exclusion are ambiguous and, read in favor of the Insureds, do not apply to damage from accumulated water.

*Finally*, this near-consensus in caselaw—until the decision below, the lone known outlier was the *Blaine* dissent—is itself strong evidence of ambiguity and the reasonableness of the Insureds' interpretations.  *See Sullins v. Allstate Ins. Co.*, 667 A.2d 617, 623-24 (Md. 1995) ("if other judges have held alternative interpretations of the same language to be reasonable, that certainly lends some credence to the proposition that the language is ambiguous").  Where courts have historically treated a policy exclusion as ambiguous, the insurer's failure to provide more specificity falls upon the insurer, not the insured.  *See, e.g., Okla. Sch. Risk Mgmt. Tr. v. McAlester Pub. Sch.*, 457 P.3d 997, 1006 (Okla. 2019) (citing

24

historical judicial interpretations as a ground for finding ambiguity); *New Castle Cty. v. Hartford Accident & Indem. Co.*, 933 F.2d 1162, 1189 (3d Cir. 1991) (recognizing that interpretations of insurance contracts by multiple courts are "reasonable" and therefore finding the language was ambiguous, which the court ultimately construed against the insurer).  This would be true even if the prior decisions were in conflict.  *See, e.g.*, *Fireman's Fund Ins. Companies v. Ex-Cell-O Corp.,* 702 F. Supp. 1317, 1323 n.7 (E.D. Mich. 1988) ("Conflicting judicial interpretations may indeed be some evidence of ambiguity. But if the policies are unambiguous, conflicting judicial interpretations do not prevent [the court] from so finding."); *C.D. Spangler Constr. Co. v. Indus. Crankshaft & Eng'g Co.*, 388 S.E.2d 557, 569 (N.C. 1990) (finding that multiple interpretations of a term by various courts were evidence that the term was "capable of several reasonable interpretations," and resolving that ambiguity in insured's favor); 16 Williston on Contracts § 49:18 (4th ed.) ("Most courts maintain that a division of judicial opinion is at least evidence of ambiguity.  This rule is based on the understanding that one cannot expect a lay person to understand the meaning of a clause when judicial minds are in disagreement." (footnotes omitted)).

The fact that the district court found the *Blaine* dissent more persuasive than the *Blaine* majority does little to dampen the *Blaine* majority's impact on the

reasonableness of the Insureds' interpretation.  Reading policy terms in conformity

with their mainstream judicial interpretation is *per se* reasonable.  Indeed,

inasmuch as *no* court had disagreed with *Blaine* in more than two decades and

counting, the Insureds cannot be said to have reached an unreasonable conclusion

in applying a *consensus* judicial interpretation to identical language in the identical

context.  *See Stanley v. Am. Motorists Ins. Co.*, 73 A.2d 1, 4 (Md. 1950) ("parties

who adopt an insurance policy, which apparently has had nationwide use and has

been judicially construed in five or six states, adopt with it the uniform judicial

construction that it has received in other states").  The *Blaine* line of cases provides

compelling proof of ambiguity.

Given the numerous judicial declarations that this language is ambiguous, in

a line of cases spanning literally half a century, the burden fell on the Insurers to

fix the patent ambiguity if that was their intent.  They could not simply ignore the

problem and hope to exploit the ambiguity in their favor when pertinent covered

perils would occur.  As *Old Town Canoe* observed:

> It cannot be said that insurers have been unaware of the ambiguity of
> clauses like this. As long ago as 1965, Judge Friendly interpreting a
> similar provision agreed the language "is not a model of clarity."
> *Aetna Ca. & Surety Co. v. Yates*, 344 F.2d 939, 940-41 (5th Cir. 1965)
> ("Loss caused by inherent vice, wear and tear, deterioration; rust, rot,
> mould, or other fungi; dampness of atmosphere, extremes of
> temperature; contamination; vermin, termites, moths or other
> insects.") The same can be said of this language forty years later.

26

2005 U.S. Dist. LEXIS 24402, at *10 n.6.  And in the ensuing years since the *Old Town Canoe* decision, this is *still* the case.  Interpreting the exclusions in the same fashion as courts have allowed in an unbroken chain for fifty-plus years is as reasonable as it gets.

      **b.**    **"Dampness of atmosphere" and "changes in temperature" are separate perils from accumulated water.**

The district court also erred by failing to recognize the distinction between accumulated water and dampness of atmosphere.  The "dampness of atmosphere" and "changes in temperature" exclusions bar coverage of certain damages "caused by" dampness or dryness of atmosphere or changes or extremes in temperature. The Policies do *not* state that the mere presence of dampness of atmosphere or changes in temperature bars coverage.  They also do not exclude physical loss caused by accumulated water or condensation.  These are all separate perils.  The Insurers have no evidence that any dampness in the air or changes in temperature caused any direct physical damage.  Thus, when the district court concluded that dampness of atmosphere and change in temperature were causes of the loss, the court necessarily concluded that the terms "dampness of atmosphere" and "changes in temperature" included the condensation and accumulated water that were the result of faulty workmanship.  In doing so, the court ignored industry

27

practice and countless examples of courts explaining when perils should be considered separately.

As a preliminary matter, a reasonable person would interpret "dampness of atmosphere" to means water in its gaseous form, *i.e.*, vapor or atmospheric moisture. By contrast, a reasonable person would consider condensation or accumulated water to be a liquid. Similarly, a reasonable person would interpret "temperature" to be a measure of heat, which also is atmospheric, as heat is not a solid or liquid. A reasonable person would not assume that water vapor and condensed water are interchangeable simply because one may transform into the other or that an atmospheric condition present when an event occurs is the same as that condition. The atmosphere is damp when it rains. Indeed, rain is caused by dampness in the atmosphere that condenses. But no reasonable person would conclude that hurricanes or tornados are caused principally by dampness of atmosphere or changes in temperature or that the perils of hurricanes and tornados are limited to the dampness of atmosphere and to temperature changes. In recognition of this, if an insurer wishes to exclude losses resulting from condensation or accumulated water, standard provisions exist to do so, examples of which can be found in the record (JA 2707 (ISO Causes of Loss Special Form containing the standard condensation exclusion alongside the dampness-of-

28

atmosphere exclusion) and the caselaw (*e.g.*, *Boardwalk Condo. Ass'n v. Travelers Indem. Co.*, No. 03cv505 WQH (WMc), 2007 U.S. Dist. LEXIS 48325, at \*27 (S.D. Cal. July 3, 2007) (ruling that condensation is a separate and distinct peril)).

Recognizing these differences, courts routinely distinguish between the perils at issue in this case.  For example, the U.S. District Court for the Southern District of California has ruled that, where an excluded design defect of inadequate ventilation causes condensation and condensation is not excluded, then condensation is a separate and independent covered peril:

> Condensation, a covered peril, is "a hazard or occurrence which causes a loss or injury, *separate and independent* but resulting from the original excluded peril," lack of ventilation. ...  [C]ondensation, while "resulting from" the lack of ventilation, is a new hazard or phenomenon, separate and independent from lack of ventilation.

*Id.* at \*27 (emphasis in original) (quoting *Acme Galvanizing Co. v. Fireman's Fund Ins. Co.*, 270 Cal. Rptr. 405, 411 (Cal. Ct. App. 1990)).  The U.S. District Court for the Central District of California has also found that a dampness of atmosphere is distinct from condensation of water:

> The report states that condensation—liquid water converted from a gas form—was the cause of the mold. It seems as though the mats were placed directly on top of the carpet, leaving no room for a damp atmosphere of any sort. Reading the policy in accordance with its plain meaning, this exclusion was not meant to bar coverage for moisture emissions from concrete slabs. Rather, the damp atmosphere exclusion is written to exclude damages from atmospheric conditions such as high

> humidity and fog: those conditions that come from the air and the sky, not water vapor emitting from a concrete slab below.

*Roger Cleveland Golf Co. v. Affiliated FM Ins. Co.*, No. SACV 08-00453 CJC (PLAx), 2008 U.S. Dist. LEXIS 127058, at *10-11 (C.D. Cal. Oct. 15, 2008).  The Louisiana Court of Appeal has even held that an insurer's denial of a claim for condensation loss caused by a design defect was arbitrary and capricious and awarded attorney's fees as bad-faith damages.  *Dawson Farms, L.L.C. v. Millers Mut. Fire Ins. Co.*, 794 So. 2d 949, 953-54 (La. Ct. App. 2001) ("[W]hile the policy language excludes damage to the warehouse arising out of defective design and construction, it covered resulting water condensation damage to the contents. Accordingly, we assess penalties and attorney fees....").

The U.S. District Court for the Southern District of Texas has also differentiated between damages caused by dampness of atmosphere and condensation.  *Scottsdale Ins. Co. v. Sally Grp., LLC*, No. 4:11-cv-01184, 2012 U.S. Dist. LEXIS 47532, at *31 (S.D. Tex. Apr. 3, 2012).  There, the moisture levels in a cigar humidor were affected by Houston's weather, which at times caused condensation to pour inside the building.  Unlike the case at bar, however, the policy in that case contained both a dampness of atmosphere exclusion *and* an exclusion for condensation of humidity for more than fourteen days.  Recognizing dual causes of loss, the court found:

30

> As is clear from the record, Rio 24's loss was caused by the presence
> or condensation of humidity for more than 14 days. Additionally, Rio
> 24's loss was caused by dampness or dryness of atmosphere. As a
> consequence, Rio 24's loss is not covered by the Building and
> Personal Property Coverage Form.

*Id.* at *31. Key to this ruling was the fact that the cigars were damaged by the

dampness in the air itself. *Id.* ("According to your insured, all of the cigars stored

in the humidor were ruined by excessive humidity. The leaf wrappers were

delaminating and there was some evidence of mold and mildew."(quoting the

record)). Here, by contrast, the Insurers make no claim that humidity or

temperature changes directly caused building damage via delamination, mold, or

mildew.

The Ohio Court of Appeals has made the same distinction between

dampness in the air and water in liquid form, citing dictionary definitions and

relying on commonsense. Even though it acknowledged that "atmosphere" could

mean "[t]he whole mass of air surrounding the earth," it applied the Insureds'

definition to apply to the air within a warehouse. Nevertheless, it still found

coverage because the exclusion for harm caused by "dampness of atmosphere"

applied only to harm caused by water vapor, not harm caused by condensed liquid

water, whatever its original source (including water vapor):

31

The word "dampness" means humidity or moisture. Accordingly, the term "dampness of atmosphere" means moisture or water vapor in the air.

The exclusion does not exclude damage from water in liquid form whatever the origin thereof but, on the other hand, does exclude damage resulting from water vapor in the air whatever may have been the origin thereof.

It could hardly be claimed that rain constitutes "dampness of atmosphere" within the contemplation of the policy.  However, *Webster's Third New International Dictionary*, 1966 Edition, defines "rain" as: "Water falling in drops condensed from vapor in the atmosphere."  Similarly, if the moisture content of the air in the warehouse became so great that it started to "rain" within the warehouse itself, the resulting water would not constitute "dampness of atmosphere."  There is no evidence that this is what occurred in this case.

There is, however, evidence presented that both the cartons in which some of the household furnishings were stored and paper inside the cartons were wet.  Construing this evidence most strongly in favor of plaintiff, reasonable minds could conclude that the damage to plaintiff's household furnishings was not caused by dampness in the atmosphere, that is by water vapor in the surrounding air, but, rather, was caused by water in liquid form.  The exclusion of "dampness of atmosphere" refers only to water vapor in the air and not water in liquid form.  In other words, the exclusion excludes damage from water in vapor form but not damage from water in liquid form.  *It makes no difference that water in liquid form may have once been water vapor, nor that water vapor may have once been in liquid form.* The essential question is whether the damage is caused by water vapor or by water in liquid form.  Under the evidence before the trial court upon the motion for summary judgment, when construed most strongly in favor of plaintiff, reasonable minds could reach different conclusions upon this issue.

32

*Andrioff v. Columbus Van & Storage, Inc.*, No. 75AP-38, 1975 Ohio App. LEXIS 8194, at \*5-7 (Ohio Ct. App. May 6, 1975) (emphasis added).  Under *Andrioff's* interpretation, which reads as both reasonable and intuitive, the loss here would be covered because it was caused by liquid water, even if the "that water in liquid form may have once been water vapor."  *Id.*  By contrast, the district court's ruling rests on the illogical interpretation that an all-risk policy that does not include an explicit condensation exclusion should be interpreted to include one implicitly because the dampness-of-atmosphere exclusion already excludes all condensation losses.  Ample case law rejects such illogic.  Given the strict mandate of D.C. law that exclusions be narrowly construed, the district court clearly erred in its expansive, liberal, and fundamentally illogical interpretation of the exclusions.

### 2.    The loss was covered water damage ensuing from faulty workmanship.

In addition to the commonsense definition of "dampness of atmosphere," the Policies' other provisions support the interpretation that the "dampness of atmosphere" cannot be reasonably interpreted to mean accumulated water caused by the failure to install a vapor-barrier system because water damage is an explicitly covered loss:  the Policies expressly cover water damage, which they define as "[a]ll water damage, except LOSS caused by or resulting from the peril of FLOOD."  (JA 1630).  FLOOD does "not include the accumulation of water

33

from any source on a roof or other surface of a building, dwelling or structure." (JA 1628).  Moreover, water damage includes "[a]ll water damage," including "the accumulation of water *from any source* on a roof or other surface of a building, dwelling or structure." (JA 1628).  Here, condensed water—not vapor— accumulated on the underside of the roof system and drained throughout the building, soaking into insulation, drywall, cabinetry, and other porous surfaces.  A reasonable person, upon reading that water damage includes "the accumulation of water from any source on a roof or other surface of a building, dwelling or structure," would believe that this includes condensation, because condensation is water accumulation.  This damage thus fits readily in the definition of "water damage" in the Policies and is expressly covered.

The Policies also have separate deductibles, separate limits, and separate coverages for specific perils, including "FLOOD" and "WATER DAMAGE," providing further evidence that the Policies expressly cover those perils.  (JA 1605) (showing separate deductibles for FLOOD and WATER DAMAGE)).  They provide coverage for all water damage, which is defined as "[a]ll water damage, except LOSS caused by or resulting from the peril of FLOOD," which in turn is defined to exclude water accumulation from any source on the roof or other surface of a building or structure: a flood "does not include the accumulation of water from

34

any source on a roof or other surface of a building, dwelling or structure." (JA 1628, 1630). Thus, the accumulation of water below a roof or on surfaces within the building is covered as water damage without regard to the source of the water. The Insurers conceded at deposition that the Policies provide coverage for water damage. (JA 1672-73).

Thus, the district court's interpretation negates an expressly covered peril—water damage—without a specific express exclusion barring that coverage. To preclude coverage for water damage only incidentally caused by or related to "dampness of atmosphere," the Policies should have added standard exclusion language excluding losses caused by condensation or otherwise providing that any "loss or damage caused directly *or indirectly* by [the excluded peril]" is barred, or that "[s]uch loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss," or that such "loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss." *See Miller v. Great Am. Ins. Co.*, 601 F. Supp. 3d 953, 956 (D. Kan. 2022) (emphasis added) (citing broad exclusion terms absent in the Policies); *Chase*, 780 A.2d at 1130 (quoting policy language that exclusion applies "regardless of ... the cause of the excluded event," or "whether other causes acted concurrently or in any sequence with the excluded

35

event to preclude the loss"); *Quadrangle Dev. Corp. v. Hartford Ins. Co.*, 645 A.2d 1074, 1076-77 (D.C. 1994) (distinguishing between one exclusion that expressly excludes an indirect cause of damage, and another lacking such "broad sweep" and thus applied only if the "excluded cause *proximately* caused the damage claimed"(emphasis in original)).

In this case, the *stipulated* cause of the covered peril is water damage resulting from the architect's failure to include a vapor barrier in the building design.  This is unquestionably the dominant, efficient cause of the loss, the cause that set the chain of events in motion.  If "dampness of atmosphere" or "change of temperature" played any causal role—and no expert opinion has been provided on the subject—that causal role was remote and indirect, at best.  Under D.C.'s "efficient proximate cause doctrine" (and the majority rule of most jurisdictions), where a covered peril is the proximate cause of a loss, even if other incidental causes contributed to cause the loss, the loss is covered.  *Chase*, 780 A.2d at 1130.  Only the "efficient proximate cause," also sometimes referred to as the "dominant" cause," constitutes the legal cause of a covered peril, absent an express exclusion stating otherwise.  *Id.*  To avoid this "default rule," *id.*, the exclusion must expressly bar losses from specified antecedent, contributing circumstances.

Under this rule, an all-risk policy excluding losses caused by rain nonetheless allows coverage where the proximate cause of the loss was a roofer's negligence in failing to cover an uncompleted roof during construction. *Allstate Ins. Co. v. Smith*, 929 F.2d 447, 451 (9th Cir. 1991). As the Ninth Circuit explained, even though "rain 'operate[d] more immediately in producing the disaster,' it was the contractor's failure to cover the premises that 'set in motion' the chain of events leading to [insured's] losses" and "therefore, was the efficient proximate cause of [the] losses." *Id.*

This case is similar. A massive water-damage loss occurred because of a failure to include a vapor barrier in the design of the Property, which resulted in a substantial amount of water condensing on the interior surfaces of the roofing system, soaking the insulation, wetting the structural wood members, raining down from the exposed ceiling, and ruining the drywall. The events in question are fully analogous to an improperly designed or covered roof that allowed water to penetrate the roof system during a storm. There, just as here, an error in the construction resulted in water damage to the building. As the Policy is a standard Builder's Risk Policy, construction-related risks to the project are covered absent a specific express exclusion, which must "be construed narrowly." *Estate of Corriea*, 719 A.2d at 1243.

37

### 3.     The "ensuing loss" exception applies and negates each exclusion, including the exclusion for faulty workmanship.

All of the exclusions at issue in this case—"dampness-in-atmosphere,"

"change-in-temperature," and "faulty workmanship" that preclude recovery for the

"cost of making good" by rectifying the flaws—have an exception for ensuing

direct physical losses.  These "ensuing loss" exceptions have essentially the same

language.  The principal exclusions (atmospheric dampness, temperature change)

provide that the Policies do "not insure LOSS caused by any of the following [four

exclusions] unless direct physical LOSS by an insured peril ensues and then this

Policy insures only such ensuing direct physical LOSS."  (JA 1617).  The "Cost of

Making Good" faulty-workmanship exclusion has similar terms, excluding from

coverage costs:

> The costs that would have been incurred to rectify any of the
> following had such rectification been effected immediately prior to
> the LOSS:
>
> > A. Fault, defect, error, deficiency or omission in design,
> >     plans, specifications, engineering or surveying;
> > B. Faulty or defective workmanship, supplies or material;
>
> However, *if direct physical LOSS by an insured peril ensues, then this
> Policy will provide cover for such ensuing LOSS only.*  For the
> purpose of this Policy and not merely this Excluded Cause of LOSS,
> insured property, or any portion thereof, shall not be regarded as
> damaged solely by virtue of the existence of any condition stated
> under A. or B. above.

(*Id.*) (emphasis added).

38

The district court found that these "ensuing loss" exceptions do not supersede their respective exclusions because the claimed losses (even if physical and directly caused by covered perils) are "'inextricably intertwined' with" the excluded perils; "[i]ndeed, ... they are 'one and the same[.]'" (JA 3029). At no point did the district court analyze the loss as being caused by the lack of a vapor-barrier system or accumulated water resulting from the lack of a vapor barrier. That ruling conflicts with *Blaine*, once again, as the policy in *Blaine* also included a traditional faulty design and workmanship exclusion, yet the Sixth Circuit found coverage. 171 F.3d at 345-46.

The district court apparently feared that the "ensuing loss" exception would swallow the exclusions. But far from curing circularity, the district court's ruling itself completes a perfect circle. The Insurers do not claim, and the district court did not find, that the Insureds seek coverage for any losses beyond the direct physical harm to the Property caused by covered perils. Thus, the ensuing-loss exception applies on its face to the stipulated facts. Extensive physical loss was principally caused by covered perils (water damage, lack of vapor lock). The fact that the exception negates the exclusions to allow for non-excluded covered perils is a function of how narrowly the exclusions were drafted, not any illogical circularity. The Policies were plainly written to provide full coverage for physical

harm directly caused by water—precisely what the Insureds claim.  The district court's circular reasoning eviscerates that broad coverage, effectively excising the ensuing-loss exceptions from the Policies and defeating their purpose:

> The [ensuing-loss] clause is intended to preserve coverage for losses caused, *in part*, by an excluded peril if a loss follows (or "ensues") from a covered peril.  Indeed, the very purpose of the ensuing[-]loss clause is to clarify that the exclusions should not swallow the basic coverage provided by the policy.

Christopher French, *The "Ensuing Loss" Clause in Insurance Policies: The Forgotten and Misunderstood Antidote to Anti-Concurrent Causation Exclusions*, 13 Nev. L.J. 215, 219 (2012) (emphasis added).

An ensuing-loss clause "act[s] as [an] exception to [the] property insurance exclusion[] and operate[s] to provide coverage when, as a result of an excluded peril, a covered peril arises and causes damage."  2 Barry R. Ostrager & Thomas R. Newman, Handbook on Insurance Coverage Disputes § 21.04[g], at 1699 (16th ed. 2013).  It is a common limitation to a cost-of-making-good faulty-workmanship or design exclusion, consigning that exclusion to the cost of curing the defect but allowing recovery for the damage caused by the defect:

> The "faulty workmanship" or "faulty design" exclusion is often drafted in such a way that loss or damage in the form of the faulty work itself is excluded, but coverage is afforded for "physical loss or damage resulting from such faulty work." ... Generally speaking, an ensuing[-]loss provision does not cover loss directly caused by the excluded peril (i.e., repair of the faulty work), but rather covers loss

caused to other property wholly separate from the defective property itself.

4 Bruner & O'Connor Construction Law § 11:418.  Maryland follows the rule that, if the loss also is an excluded peril or loss under the policy, then no coverage exists, but, if the policy covers the peril or loss that results from the excluded event, then the ensuing-loss clause provides coverage.  Maryland applies that rule to water damage resulting from an excluded event—the very scenario here.  *See Selective Way Ins. Co. v. Nat'l Fire Ins. Co.*, 988 F. Supp. 2d 530, 538-41 (D. Md. 2013) (finding that, where faulty workmanship was excluded and a water supply line separated due to faulty workmanship, the water damage was covered, but the pipe repair was not, under the ensuing-loss clause because it was "a step removed from the faulty workmanship and was not directly caused by it"); *see also Bethany Boardwalk Grp. LLC v. Everest Sec. Ins. Co.*, No. ELH-18-3918, 2020 WL 1063060, at *14 (an "ensuing[-]loss provision does not cover loss caused by the excluded peril, but rather covers loss caused to other property wholly separate from the defective property itself" (quoting *Montefiore Med. Ctr. v. Am. Prot. Ins. Co.*, 226 F. Supp. 2d 470, 479 (S.D.N.Y. 2002))).[3]  This is a common scenario for

---

[3] Maryland cases have long interpreted ensuing-loss clauses broadly.  *See Bethany Boardwalk Grp*, 2020 WL 1063060, at *13 ("there is good reason to think that Maryland law favors a broad construction of the ensuing[-]loss clause").  *Selective*

coverage of water damage resulting from an excluded peril. *See Leep v. Trinity Universal Ins. Co.*, 261 F. Supp. 3d 1071, 1084-85 (D. Mont. 2017) (finding coverage under ensuing-loss clause for water-vapor damage caused by faultily installed furnace, but excluding coverage for furnace repair or replacement); *Ass'n of Apartment Owners of Imperial Plaza v. Fireman's Fund Ins. Co.*, 939 F. Supp. 2d 1059, 1073 (D. Haw. 2013) (allowing coverage for damage caused by moisture infiltration resulting from design defect of constructing building floor without removing certain insulation); *Bartram, LLC v. Landmark Am. Ins. Co.*, 864 F. Supp. 2d 1229, 1235 (N.D. Fla. 2012) (under ensuing-loss exception to faulty-workmanship exclusion, finding coverage for "water intrusion that occurred

---

*Way* noted that Maryland law has similarly construed ensuing-loss clauses for over a century, citing *Transatlantic Fire Ins. Co. of Hamburg, Germany v. Dorsey*, 56 Md. 70, 80 (1881) (holding that where explosions are excluded, but ensuing losses are covered, a fire caused by an explosion is covered, even where the direct explosion damage is not); *see also McEvoy v. Sec. Fire Ins. Co.*, 73 A. 157, 160 (Md. 1909) (concluding that policy's ensuing-loss clause did not cover "direct loss caused by ... independent destructive forces" but did cover "the loss caused by fire ensuing from them"). Where no D.C. law is on point, this Court should "look to Maryland law first because … the District of Columbia derives its common law from that state and because District of Columbia courts have in the past looked to Maryland law for guidance." *Conesco Indus. v. Conforti & Eisele, Inc.*, 627 F.2d 312, 315-16 (D.C. Cir. 1980); *see also Forrest v. Verizon Comm'ns, Inc.*, 805 A.2d 1007, 1012 n.12 (D.C. 2002) ("Maryland Court of Appeals' decision[s] [are] ... especially persuasive authority when the District's common law is silent" (internal quotation marks omitted)).

42

because of the faulty workmanship," causing "damage to the buildings' exterior and interior finishes, wood sheathing, framing, balcony systems, drywall ceilings, and stuccoed walls.  These damages are separate from the work needed to simply fix the faulty workmanship"); *Eckstein v. Cincinnati Ins. Co.*, 469 F. Supp. 2d 444, 454 (W.D. Ky. 2007) (agreeing with plaintiff "that the major damage in this case is water damage, and, that such damage is an ensuing loss from the faulty construction and, thus, covered by the Policies"); *Arnold v. Cincinnati Ins. Co.*, 688 N.W.2d 708, 722 (Wis. 2004) (holding that ensuing-loss clause provided coverage of water damage caused by rain following defective caulking, but the cost to fix the caulking was excluded due to faulty workmanship); French, *supra*, 13 Nev. L.J. at 219 (explaining that an ensuing-loss clause permits recovery for water damage from a negligently installed leaking roof, despite a faulty-workmanship exclusion because, even if "the negligent installation of the roof played a role in the chain of events that led to the damage," the claim "is for the rainwater damage to the interior of the house, not the costs to repair the roof.  It is undeniable that the water damage ensued from a covered peril—rain.").  The same reasoning applies to similar catastrophic events, such as a fire, triggered by design or workmanship defects.  *See, e.g.*, *Fruchtandler v. TriState Consumer Ins. Co.*, 96 N.Y.S.3d 649, 651 (N.Y. App. Div. 2019) (finding coverage under ensuing-loss clause for fire

43

caused by faulty workmanship two years earlier; damaged property was separate from the defective junction box).

Sometimes, faulty-workmanship exclusions are written more broadly to apply to all damages proximately caused by the faulty workmanship without a new intervening cause, in which case the ensuing-loss exception is narrowly construed to avoid swallowing the exclusion. *See, e.g.*, *Bartram*, 864 F. Supp. 2d at 1233-34 (distinguishing *TMW Enters., Inc. v. Fed. Ins. Co.*, 619 F.3d 574, 576 (6th Cir. 2010)); *Leep*, 261 F. Supp. 3d at 1083-84 (same). But the exclusions here lack any broad term that could support such an interpretation, instead carving out from the exclusion any ensuing losses for an "insured peril," and thus allow coverage here despite the role of faulty design in triggering the chain of events. *Id.*; s*ee also, e.g.*, *Vision One, LLC v. Philadelphia Indem. Ins. Co.*, 276 P.3d 300, 308-09 (Wash. 2012) (holding that ensuing-loss clause restored coverage to collapse damages because collapse is covered under the policy, despite the cause of the collapse being attributable to the faulty workmanship of the insured).[4] This is a perfectly

_____

[4] Notably, in one recent case applying Maryland law that did not allow coverage under an ensuing-loss clause, the claimed loss (collapse of a building) *directly* resulted from the excluded peril (defective design and construction); no intervening event occurred. *See Jowite Ltd. P'ship v. Fed. Ins. Co.*, No. DLB-18-2413, 2020 WL 4748544, at *8 (D. Md. Aug. 17, 2020), *aff'd*, 2021 WL 5122173 (4th Cir. Nov. 4, 2021) (per curiam). Moreover, the policy language was so

reasonable reading of the Policies: "construing the ensuing[-]loss provision in a manner which maintains the exclusion for faulty workmanship, but provides coverage for a subsequent covered loss that occurs as a consequence or result of the faulty workmanship, is a reasonable interpretation of the policy language" because it "preserves the faulty workmanship exclusion, and relieves the insurer from the obligation of insuring the quality of any work performed on the premises, while at the same time provides coverage for subsequent losses which would otherwise be covered by the policy." *Leep*, 261 F. Supp. 3d at 1084-85.

As for the dampness-of-atmosphere and change-of-temperature exclusions, their ensuing[-]loss exceptions apply even under the district court's logic. As discussed above, unlike the architect's design defect here, neither dampness of atmosphere nor change of temperature were the proximate, dominant, or efficient cause of the claimed loss. Rather, the loss resulted primarily from condensation and accumulation of water. The district court's belief that the excluded perils (indoor humidity or temperature change) were "inextricably intertwined" with the

------

different that, in affirming, the Fourth Circuit distinguished *Selective Way* and *Bethany Broadway* as "inapposite" on that basis alone. *See* 2021 WL 5122173, at *3 n.2. Similarly, in *James McHugh Constr. Co. v. Travelers Prop. Cas. Co. of Am.*, 223 F. Supp. 3d 462, 473-74 (D. Md. 2016), the damage (scratched windows) was the direct result of the excluded peril (faulty workmanship while cleaning the windows).

45

ensuing covered peril (water accumulation), rendering the ensuing-loss exception

inapplicable, is simply wrong under D.C.'s efficient proximate cause doctrine.  The

clause must be read expansively to extend "coverage to a covered event traceable

to an excluded peril."  *Bethany Boardwalk Grp.,* 2020 WL 1063060, at *13

(rejecting reading a "separate and independent" limitation into an ensuing-loss

clause under Maryland law).  But even if, *arguendo*, D.C. law were to require

"separate and independent" causes, that test is met here: the proximate cause of

harm in this case (water accumulation) *is* the covered peril, *not* the excluded peril

(humidity or temperature change), so the district court's finding that they are "one

and the same" is wrong.  Even the "separate and independent" jurisdictions

acknowledge that "coverage will be reinstated under the [ensuing-loss] exception

to the exclusion when an excluded risk sets into motion a chain of causation which

leads to a covered cause of loss.  In that case, the policy insures against damage

directly caused by the ensuing covered cause of loss."  *Weeks v. Co-Operative Ins.

Co.*, 817 A.2d 292, 296 (N.H. 2003).  The ensuing-loss exception thus prevents an

exclusion of a concurrent or antecedent cause from preventing coverage for an

ensuing essential cause of the loss:

> [W]hen the ensuing[-]loss clause is in play, whether an excluded peril
> had a role in causing the damage should not be determinative.  If it
> were, then the ensuing[-]loss clause, which appears *in the exclusions
> themselves*, would be superfluous because it would be overridden in

46

> every case in which an excluded peril played any role in causing the
> loss. Such a result is contrary to the way the ensuing[-]loss clause is
> intended to operate.

French, *supra*, 13 Nev. L.J. at 219 (emphasis in original). That is exactly the

situation here. The Insurers at most contend (but have yet to prove) that

atmospheric dampness set in motion the condensation and accumulation of water

that eventually caused the loss, *not* that this extensive damage directly resulted

from mere humidity or temperature change. D.C. law per *Chase* and *Quadrangle*

thus requires coverage under the ensuing-loss exception because the essential *legal*

cause of the loss is accumulation of water, *not* a mere change in indoor humidity.

Finally, the district court misread the Policies in concluding that, due to the

cost-of-making-good exclusion, the Insurers' claimed physical loss is not the result

of an "insured peril" and thus is not covered. (JA 3027). In the context of all-risk

policies, where loss from faulty workmanship or design is covered absent an

exclusion, the Policies' cost-of-making-good exclusion merely means what it says:

that the cost to "rectify" (*i.e.*, repair) faulty workmanship or design is not covered,

but physical damage resulting from that faulty workmanship is covered. In other

words, the Policies do not exclude losses caused by defective design or

workmanship, but instead exclude only the cost of rectifying that defective design

or workmanship; they expressly cover the loss and damage that subsequently

results from any defective design.

In accord with these clear terms, when the Insureds did file a claim after the extensive Property damage, they did not include their cost of installing a new vapor barrier.  Indeed, even if the Insureds had timely discovered the lack of a vapor barrier before the Property damage, their cost to repair the defect would not have been covered.  But that is all that the exclusions remove from coverage.  The exclusions expressly exempt from their scope the physical damage to *other* portions of the Property directly caused by the lack of vapor barrier and thus do not preclude coverage for that physical loss.

In ruling otherwise, the district court made the *same* logical error that it charged the Insureds with making.  It found that the Insureds "conflated" the damages and peril "in an attempt to shoehorn in coverage for losses caused by peril that is explicitly not covered under an insurance policy."  (JA 3028).  To the contrary: it is the Insurers and the district court who conflate peril and damage. The proximate cause of the loss was faulty work (a covered peril), which resulted in water accumulation (a covered peril).  The Insurers argued below that the Policies exclude faulty workmanship as a covered peril because the cost-of-making-good exclusion provides that the Property "shall not be regarded as damaged solely by virtue of the existence of" defective design or faulty workmanship.  (Dkt. 46, Def. Sur-Reply 2-3).  But this provision merely states

that the existence of faulty workmanship or design is not per se *damage*; it does not state that faulty workmanship is not a *peril.*  The definition of "peril" is "exposure to the *risk* of being injured, destroyed, or lost."  *Peril*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/peril (last visited Feb. 15, 2023) (emphasis added).  By contrast, "damage" is defined as "loss or harm *resulting* from injury to person, property, or reputation."  *Damage*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/damage (last visited Feb. 15, 2023) (emphasis added).  The exclusion ("shall not be regarded as damaged solely by virtue of the existence of [defective design or faulty workmanship]") simply states that the existence of faulty workmanship or design is not necessarily damage to the Property.  Reading it more broadly as excluding coverage for faulty workmanship and design plainly conflates "damage" with "peril."

For example, if a lighting fixture is installed upside down, this is faulty workmanship, but the faulty installation, alone, has not damaged the property and the cost to repair it is not be covered, per the exclusion.  If, alternatively, a lighting fixture is installed upside down, catches fire, and burns the drywall, the damage to the drywall by the faulty workmanship and ensuing fire is covered.  So, too, here.

The district court's reading of the cost-of-making-good exclusion thus is fundamentally circular.  It reasons that, because the exclusion allows for recovery

49

for direct physical LOSS if "direct physical LOSS by an insured peril ensues," the exception applies only to an "insured peril," and "[w]as the loss here caused by an 'insured peril'?  It was not.  The loss was caused by expressly excluded perils—'dampness of atmosphere' and 'changes in temperature.'"  (JA 3030).  For the reasons stated above, the last statement is wrong: water damage *is* an expressly covered peril and faulty workmanship is covered as well.

## CONCLUSION

The district court's decision erroneously rejects settled law interpreting the insurance provisions at issue, as well as the commonsense interpretation that a reasonable person could readily reach.  Because the water damage that occurred on the Property is a covered peril and is not subject to any exclusion in the Policies, the decision should be reversed and the case remanded to the district court for entry of summary judgment on the Insureds' cross-motion.  Alternatively, the case should be remanded for further proceedings.

## ORAL ARGUMENT IS RESPECTFULLY REQUESTED

Respectfully submitted,

/s/ Erik Broch Lawson

Mitchell Y. Mirviss                     Erik Broch Lawson
Elizabeth Clark Rinehart                Silver & Brown, P.C.
Venable LLP                             10621 Jones Street, Suite 101
750 East Pratt Street, Suite 900        Fairfax, Virginia 22030
Baltimore, Maryland 21202               Tel.: (703) 591-6666
Tel.: (410) 244-7400                    Fax: (703) 591-5618
Fax: (410) 244-7742                     erik@virginia-lawyers.net
mymirviss@venable.com
ecrinehart@venable.com

Counsel for Plaintiffs-Appellants

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

__x__ The brief contains 11,565 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

____ The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

__x__ The brief has been prepared in a proportionally spaced typeface using MS Word 2007 in a 14 point Times New Roman font or

____ The brief has been prepared in a monospaced typeface using MS Word 2002 in a ___ characters per inch_____ font.

/s/ Erik Broch Lawson
Erik Broch Lawson